IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                        Crim. No. 17-1826 MV

JUAN CARLOS QUEZADA-LARA,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on defendant Juan Carlos Quezada-Lara's Motion to Suppress Evidence [Doc. 22]. The government opposes the motion. The Court conducted a hearing on the motion on March 30, 2018. Based upon the pleadings of the parties, the evidence presented during the hearing, and applicable law, Mr. Quezada-Lara's motion is hereby denied.

**I. Introduction**

On June 19, 2017, a vehicle driven by Mr. Quezada-Lara struck an FBI Task Force Officer while officers were attempting to apprehend him. Mr. Quezada-Lara then fled the scene. Later that day, Mr. Quezada-Lara's girlfriend reported that his vehicle had been stolen. The vehicle was eventually found abandoned.

Based on information provided by the girlfriend, agents went to Mr. Quezada-Lara's residence in Albuquerque later that night. While there, they saw his girlfriend leave the residence. Agents made contact with her, and she told them that Mr. Quezada-Lara lived at the residence and she stayed there off and on. She gave agents her key to the residence and permission to search the premises for Mr. Quezada-Lara.

Agents surrounded the residence and made contact with Mr. Quezada-Lara's grandfather, Martin Lara, who lives at the residence. Mr. Lara gave the agents both verbal and written permission to search the house. During the search of Mr. Quezada-Lara's bedroom, agents located two loaded firearms. Additional rounds of ammunition were found in a bedside drawer.

On July 11, 2017, Mr. Quezada-Lara was indicted on one count of Assaulting, Resisting, and Impeding a Federal Officer in violation of 18 U.S.C. § 111, and one count of Prohibited Person in Possession of Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(3) and (5).

In his Motion to Suppress, Mr. Quezada-Lara contends that his grandfather suffers from dementia, does not speak English very well, and did not have either actual or apparent authority to consent to the search. The government asserts that Mr. Lara had either actual or apparent authority to consent to the search, and that his consent was voluntarily given.

## II. Applicable Law

The Fourth Amendment generally prohibits the government from making a warrantless entry into a person's residence to search for specific objects. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The general rule has exceptions, one of which is "situations in which voluntary consent has been obtained, either from the individual whose property is searched or from a third party who possesses common authority over the premises. *United States v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004) (citing *Rodriguez*, *supra*). "Before a district court may admit evidence resulting from a consent search, it must determine from the totality of the circumstances that (1) the [individual's] consent was voluntary and (2) the search did not exceed the scope of the consent." *United States v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005) (citations omitted).

The government, as the party asserting the officers had obtained consent to search from

an individual having actual or apparent authority over the premises, bears the burden of proof. *United States v. Cos,* 498 F.3d 1115, 1124 (10th Cir. 2007) (citation omitted).

### III. Factual Background

The search of Mr. Quezada-Lara's house occurred late on the night of June 19 and in the early morning hours of June 20, 2017, while law enforcement was looking for Mr. Quezada-Lara in connection with an assault on an officer earlier that day. [TR at pp. 4-5]. A few hours after the assault, Mr. Quezada-Lara's girlfriend had reported his car stolen to the Albuquerque Police Department, and provided law enforcement with his home address. *Id.* at 5. The car was registered to that address. *Id.*

#### A. Testimony of FBI Agents Acee and Stemo

FBI Special Agent Bryan Acee testified that around midnight, law enforcement established surveillance on the house, which was located at 10801 Cartagena Avenue in the South Valley area of Albuquerque. *Id.* at 6. Shortly after surveillance began, law enforcement observed a light blue SUV departing the property. Agent Agee recognized it because he believed it had picked up Mr. Quezada-Lara earlier in the day after he fled from agents. *Id.* Suspecting that Mr. Quezada-Lara might be in the car, the agent activated his lights and pulled the car over. *Id.* at 7. However, the only person in the car was Mr. Quezada-Lara's girlfriend, Jessica Artega. *Id.* at 7, 112. Agent Acee explained to her that law enforcement was looking for Mr. Quezada-Lara. Ms. Artega told him that she stayed at Mr. Quezada-Lara's house off and on, that she had brought food to the house for Mr. Quezada-Lara's grandfather that evening,[1] and that she was

---

[1] Agent Acee testified that he never asked Martin Lara how long he had lived there, but he "did have some sense he had been there for a while," because Jessica left him with the impression that "Martin lived there and that she would come by and feed him occasionally and had that night." *Id.* at 45-46.

"50 percent sure [Mr. Quezada-Lara] himself was in the house." *Id.* at 7-8. Additionally, she said that Mr. Quezada-Lara had a .45 pistol. *Id.* at 57. Ms. Artega told the agent that she had a key to the house, and she agreed to go back there with him. *Id.*[2] She also told him that the grandfather was hard of hearing. *Id.* at 9.

Ms. Artega accompanied Agent Acee back to the house, but remained in his car with FBI Agent Nancy Stemo while agents approached the house. *Id*. at 57, 68. Agent Acee testified that although Ms. Artega had given him a key, he was reluctant to use it, and elected to knock and announce his presence first. He knew from his conversation with Ms. Artega that the grandfather was in the house, there was a good chance that Mr. Quezada-Lara was there, and the second suspect agents were looking for might also be there. *Id.* at 7-8. Based on these factors, and his concern for the safety of the officers and agents, he believed that it would be better to surround the location and call the person out. *Id.* at 8. The agents knocked on the front door and the windows and called out to the occupants of the house, but received no response. *Id.* at 7-8. Officers from the Albuquerque Police Department arrived and turned on their lights and spotlights. *Id.* at 8.[3] Law enforcement also used a public address system, but to no avail. *Id.*

Ultimately, agents went to the back of the house and started knocking on the back door. *Id.* at 9. They saw the bedroom blinds in a window move, and Mr. Lara looked out. *Id.* Agent Acee testified that "it was pretty apparent to me that we'd woken him up," and he looked "startled." *Id.* He stated that when Mr. Lara first opened the window blinds, agents had their weapons drawn, but once they saw him, they lowered their weapons and Agent Acee used a

---

[2] The agent testified that although Ms. Artega gave him consent to search the house, he was not certain she had the authority to consent to the search. *Id.* at 29.

[3] Agent Acee testified that altogether, 10 to 12 agents officers were on-scene. *Id.* at 37. Some were in the neighbors' yards peering over the wall, and some were on the property. *Id.*

flashlight instead of his weapon light. *Id.* at 11-12. Speaking English, agents identified themselves and asked him to come to the back door. *Id.* at 10. However, Agent Acee became concerned that the individual might speak only Spanish, so he summoned Agent Stemo, who speaks Spanish fluently, to talk to him. *Id.* He said that although Mr. Lara initially seemed to be startled, he was cooperative and friendly. *Id.* Based on his observations, Mr. Lara appeared to understand what Agent Stemo was telling him. *Id.* at 11. Agent Stemo told Mr. Lara that they were with the FBI, and then—realizing that he might not know what "FBI" is—that they were the police. *Id.* at 85. She asked him if he could come to the back door and talk to them, and he nodded his head and then disappeared. *Id.* at 1l, 85.

Using the house key Ms. Artega had provided to Agent Acee, other agents unlocked and opened the back door. *Id.* at 40. Agent Stemo moved from the window to the back door and called for Mr. Lara to come out. *Id.* at 40. All of the agents stayed outside. *Id.* at 40-41. Agent Stemo periodically peeked around the doorway to see if he was there, and eventually, he appeared in the hallway. *Id.* at 71. Agent Stemo reassured him they were the police, and continued to ask him to "come to us." *Id.*

Mr. Lara came out of the house and sat in a chair on the porch. *Id.* at 11. Agent Stemo gave Mr. Lara a brief summary of why police were there, telling him "his grandson had been involved in an incident earlier . . . and we were looking for him and we thought he might be inside the house." *Id.* at 72. Through Agent Stemo, Agent Acee asked Mr. Lara if his grandson was in the house. *Id.* at 14. Mr. Lara said he had been there earlier in the day for a little while, and he mentioned his grandson had taken a shower. *Id*. at 14, 19. However, he did not know whether he was there now. *Id.* at 19. He gave agents verbal permission to clear the house and verify whether Mr. Quezada-Lara or the other defendant were there. *Id.* at 12, 72-73. At Agent

5

Acee's request, Agent Stemo asked Mr. Lara who else was in the house. *Id.* at 44. Mr. Lara told the agents his daughter and a grandson lived there, but he didn't know who was home. *Id.* at 44-45. Agent Stemo then asked him if agents could go through the house and clear it and check it. *Id.* at 45-46. Mr. Lara said "yes" in Spanish. *Id.* at 46. Agent Acee then told the agents "that we had consent and to do a clear." *Id.*

During the initial safety clear, Agent Acee saw drug paraphernalia—specifically small plastic bags containing residue of what he believed was methamphetamine—on the dresser in the bedroom that Mr. Lara later identified as Mr. Quezada-Lara's. *Id.* at 15.[4]

Agent Stemo testified that while she was talking to Mr. Lara on the back porch, he seemed to understand what she was telling him. *Id.* at 74. She believed he understood what she was telling him because he was responding to her questions with answers that were plausible and did not need her to explain anything. *Id.* He was responsive, his answers made sense to her, and they indicated to her that he understood what was being asked. *Id.* Mr. Lara did not seem scared, and was actually joking with her. *Id.* at 73. Agent Stemo testified:

> At one point, I asked him how old he was, because he reminded me of my dad, actually. And he said 50, which I thought was not correct. I thought he was a little bit older. And then he smiled and he looked at me, and he grabbed my hand and started patting it. And based on my experience with my family, we tend to lie about our age and say that we're younger, as a joke.

*Id.* at 73-74.

After the safety clear search, Mr. Lara, Agent Stemo and Agent Acee went into the kitchen and sat at the kitchen table. *Id* at 12, 75.[5] Mr. Lara did not appear to be uncomfortable,

---

[4] No evidence was introduced that the bedroom door was locked or padlocked.

[5] Agent Stemo testified that one other agent may have been in the kitchen "standing around." *Id.* at 98. She said that all three were armed, but her weapon was holstered and the other two agents had their rifles over their shoulders. *Id.* at 98-99. However, Agent Acee testified that before

6

and he carried on a conversation with Agent Stemo. *Id.* at 12-13. Mr. Lara told them he lived there with his daughter and his grandson. *Id.* at 76. Agent Stemo explained that agents were there because they believed his grandson had been involved in an accident where he ran over one of their task force officers. *Id.* at 78. She told him agents were looking for drugs or firearms, and he responded that he didn't have any guns and his daughter didn't like them. *Id.* at 78-79.

When Agent Acee was in the kitchen with them, Mr. Lara spoke some English, but otherwise, he spoke only Spanish. *Id.* at 13. Agent Acee testified that Mr. Lara never gave him any indication that he was unwilling to cooperate; to the contrary, he was "hospitable." *Id.* Mr. Lara offered Agent Acee something to eat. *Id.* at 13, 21. Agent Acee accompanied Mr. Lara to his bedroom to find something for him; Agent Acee couldn't remember if it was a jacket or a bathrobe, or maybe shoes, but Mr. Lara, through Agent Stemo, was telling him where the item was. *Id.* at 13.

Through Agent Stemo, Mr. Lara told Agent Acee that Mr. Quezada-Lara had been at the house earlier in the day for a little while, but he did not know whether he was still there. *Id.* at 14. He told agents his grandson's bedroom was located by the back door, and showed Agent Acee the bedroom. *Id.* It was the bedroom where Agent Acee had seen the drug paraphernalia during the initial search to clear the house. *Id.* Mr. Lara told the agents that his grandson sometimes slept in a shed in the backyard, and, as a result, agents searched it twice. *Id.* Agent Acee testified the shed was "very cluttered, so much so that a person couldn't live in there," and that agents had to move items around just to clear it. *Id.* at 14-15.

Agent Stemo presented Mr. Lara with a Spanish language consent to search form, and went through it with him. *Id.* at 15; Govt. Ex. 1. She asked him if he had any questions about

going in the kitchen he thought he went back to his vehicle, put his rifle away, and retrieved consent to search forms. *Id.* at 49.

7

the form. *Id.* at 79. He did not. *Id.* Agent Stemo testified that when she was reading the form to him, Mr. Lara appeared to understand it, was nodding his head up and down, and never hesitated to sign the form. *Id.* at 79-80.

Agent Acee also testified that when Agent Stemo spoke in Spanish with Mr. Lara, he saw him shaking his head up and down. *Id.* at 17. He was friendly and helpful, and showed no hesitation about signing the consent form. *Id.*

After Mr. Lara signed the consent form, agents—including Agent Acee—conducted a full search of the house. *Id.* at 18-19. During the search of Mr. Quezada-Lara's bedroom, they found—in addition to the baggies previously described—two firearms and ammunition. *Id.* at 19. In the bathroom, they found some of Mr. Quezada-Lara's clothing. *Id.* When Agent Acee showed Mr. Lara the two guns found in the bedroom and asked who slept in the bedroom, Mr. Lara stated he had seen is grandson in there and had seen him working on little cars. *Id.* at 95.

Agent Stemo sat at the kitchen table with Mr. Lara for 30 or 45 minutes during the search of the house. *Id.* at 80. They talked about who lived there, and he told her his daughter had gone to Mexico. *Id.* at 94. She said he "may have mentioned Mr. Quezada-Lara's girlfriend," and he "spoke about what he ate for dinner, he offered us dinner." *Id.* He did not repeat himself, and did not seem to be mumbling. *Id.* According to Agent Stemo, Mr. Lara appeared to have his wits about him, never gave any indication that he was suffering from some type of dementia, and never said "I don't remember" to any of her questions. *Id.* at 81. Agent Stemo testified that she and Mr. Lara talked about his daughter going to Mexico pretty frequently, and he also said he had another daughter that would come up and visit them and occasionally stay at the house. *Id.* at 96.

At one point, Mr. Lara asked her to get his hat, and directed her to his bedroom. *Id.* at 80.

She had an opportunity to observe his belongings, and it looked as if he was moved into his bedroom. *Id.* He at no time changed his mind about whether it was okay for agents to be there or indicated there was any area of the house that he did not want agents to search. *Id.* at 81.

Agent Stemo also testified that, at one point, Agent Acee showed Mr. Lara two firearms, and Mr. Lara did not recognize them. *Id.* at 95. She stated, "Martin had previously told me that his grandson lived outside or slept outside sometimes, but when we asked about the firearms and asked further who slept in that bedroom, he stated he had seen his grandson in there and had seen him working on little cars." *Id.* at 95.

### B. Testimony of Martin Lara

Mr. Lara took the witness stand during the hearing. He could not correctly remember his current age or where he lives, why he was in court, or that his grandson was there. [TR at 102-104]. He said that he remembered Agent Stemo's testimony earlier in the day, and that he had seen her before, but that was in Las Cruces. *Id.* at 105. He testified that police had never been to his house, although he used to run into them in places like Saltillo, Camargo and Jimenez, when he lived on a ranch. *Id.* at 106. He had no memory of police coming to his window in June of 2017. *Id.* at 107. He remembered talking to police in the past, but stated that they had never been to his house. *Id.* When he was asked if he remembered sitting in his kitchen with police last year in Albuquerque and signing a paper, he responded:

> I don't remember that. I think maybe this is, like something that some of the other young men told me that had happened, that there were police officers that were going all over and all around all the little ranches in the area that were there. I think maybe somebody told me that.

*Id.* at 108. Asked how old he was, Mr. Lara responded, "I'm really old. I'm, like, you know, like 33, 34, I think." *Id.* at 109.

9

### C. Testimony of Rosa Lara Baillon

Mr. Lara's daughter, Rosa Lara Baillon ("Ms. Lara"), is Mr. Quezada-Lara's mother. She testified that her father lives at her house, has his own bedroom and has full access to everywhere in the house. *Id.* at 120. She explained that her father has been receiving treatment for Alzheimer's by a psychiatrist at First Choice Clinic for five years. *Id.* at 114. Ms. Lara testified that she had to go to Ciudad Juarez to check up on her mother and was gone from June 18-20, 2017. *Id.* at 112. She asked Ms. Artega to "check on the house, to come by the house to take care of things" while she was gone. *Id.* Ms. Artega called her on June 19 and asked if she could come back home because "[t]here's something going on at home," but Ms. Lara could not get back right away. *Id.* at 113. She said that when she returned the next day, she found a "right hand door" and the window of her father's room broken. *Id.*[6] When she asked her father what had happened, "he was crying and he said, 'They tried to kill me. They wanted to kill me.'" *Id.*

Ms. Lara testified that her father's dementia worsened after the search of the house in June 2017. *Id.* at 121. She now takes care of her father 24 hours a day and checks up on him several times at night because he talks and yells and says that someone is coming in through the window. *Id.* at 115-16.

### D. Psychiatric Consultation Summaries

A Psychiatric Follow-up Consultation Report summarizing an August 14, 2017, examination (approximately two months after the search of the house) indicates that at that time, Mr. Lara suffered from "moderate" Alzheimer's dementia with behavioral components. [Def. Ex. A at 2]. The Consultation Report characterized his dementia as "advanced." *Id.* at 1. It

---

[6] Agent Stemo testified that when she approached Mr. Lara's bedroom window, she saw that it was broken. *Id.* at 84. However, she did not know who broke it, or when or how it was broken. *Id.* at 85.

described his behavior as "[j]ocular and with poor memory;" his mood as "[j]ocular[] without agitation, good social skills;" and his "thought content" as "impoverishment of thinking." *Id.* at 1. It was reported that he suffered from chronic insomnia, had "no insight," and with respect to judgment, had "no decisional capacity." *Id.* at 1.

The defense also introduced a second Psychiatric Follow-up Consultation Report summarizing a February 19, 2018, examination (approximately five weeks before the hearing in this matter). *Id.* The summary report stated that Mr. Lara has Alzheimer's dementia, and characterized it as "advanced." *Id.* at 3. It described his behavior as "cooperative with interview," and labeled his speech as "[p]aucity." His mood was "jocular;" and his memory was "[i]mpaired to recent, [i]mpaired to remote, [i]mpaired to executive function." *Id.* at 1. He was described as having limited insight and judgment. *Id.* He was again described as suffering from chronic insomnia. *Id.* at 3.

## IV. Analysis

### A. Authority to Consent to Search

It is the government's burden to establish by a preponderance of the evidence that Mr. Lara had authority to consent to the search of his grandson's bedroom. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Rith*, 164 F.3d 1323, 1328 (10th Cir. 1999). "[A] third party has actual authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Rith*, 164 F.3d at 1328-29. "[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom the authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974).[7]

---

[7] "Even when actual authority is lacking, a third party has apparent authority to consent to a

The Tenth Circuit has explained how mutual use of property and control for most purposes, the two alternative types of actual authority, are established. First,

> Mutual use of property by virtue of joint access is a fact-intensive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search.

*Rith*, 164 F.3d at 1329-30. Alternatively,

> Unlike the fact-intensive inquiry of mutual use, control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party. If a relationship creates such a presumption of control and is unrebutted, the third party has authority to consent to a search of the property.
>
> Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships. . . In contrast, a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown.

*Id*. at 1330. In this case, testimony from Mr. Lara and his daughter indicates that Ms. Lara was the head of the household, and that Mr. Lara and his adult grandson, Mr. Quezada-Lara, also resided in the home. Although they are family members, Mr. Lara's relationship to his adult

---

search if a police officer reasonably, but erroneously believes that the third party has actual authority to consent." *United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007) (citing *Georgia v. Randolph*, 547 U.S. 103, 109 (2006); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); and *United States v. Andrus*, 483 F.3d 711, 716 (10th Cir. 2007)). "The apparent authority inquiry is an objective one; [the court] must determine whether 'the facts available to the officer at the moment . . . warrant a man of reasonable caution [to believe] that the consenting authority had authority over the premise[.]'" *Cos*, *supra*, (citing *Rodriguez*, 497 U.S. at 188, and *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1280 (10th Cir. 1998)). "[A] third party has apparent authority if the officer has a reasonable belief that the third party has '(1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it.'" *Id.* (citing *Rith*, 164 F.3d at 1329). "Police officers must evaluate the surrounding circumstances in order to determine whether a reasonable person would 'act upon [the invitation] without further inquiry." *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004) (quoting *Rodriguez*, 497 U.S. at 188)).

In this case, because the evidence establishes that Mr. Lara had actual authority to consent to the search, the issue of apparent authority is moot. The parties' arguments regarding Mr. Lara's dementia, although posed to the Court as an issue of apparent authority, are properly considered in terms of whether Mr. Lara's consent to search was voluntary. *See* IV. C., *infra*.

grandson, under *Rith*, may not merit the same presumption of control of property as a relationship between a parent and child. On the other hand, their relationship is likely more familiar than that of co-tenants. The Court in *Rith* explains that the difference between certain familial relationships and a co-tenant relationship is that the close familial relationship "raises a presumption about the parties' reasonable expectation of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship." *Id*. at 1329-30. The Court goes on to explain that in evaluating a familial relationship, paying rent, having a lock on a bedroom door, or having an explicit or implicit agreement that an area was private could rebut a presumption of control over property. *Id*. at 1330-31. In *United States v. Romero*, 749 F.3d 900 (10th Cir. 2014), the Tenth Circuit expanded the scope of familial relationships giving rise to a presumption of control, holding that a stepparent living with his stepchild had authority to consent to search. The Court cited *United States v. Acosta*, 807 F. Supp.2d 1154, 1211 (N.D. Ga. 2011), for the notion that "typically, *all family members have common authority over all of the rooms in the family residence*." *Id.* at 906 (emphasis added). The Tenth Circuit concluded that:

> [W]hen officers know facts creating a presumption of authority to consent, the officers need not make further inquiry into authority *unless they learn additional facts (such as that the stepson pays rent) that may undermine the presumption.* Here, if the agents had learned that Defendant kept a lock on his door and that Mr. Martinez did not enter his bedroom, they may no longer have been justified in relying on Mr. Martinez's consent to search the bedroom.

*Romero*, 749 F.3d at 907 (emphasis added).

Here, the government presented evidence that the officers knew facts creating a presumption of authority to consent. Ms. Artega told the officers that Mr. Lara was the grandfather of Mr. Quezada-Lara, and Mr. Lara told the officers that he lived there with his daughter and grandson. Mr. Lara showed the agents his bedroom as well as his grandson's bedroom. Although Mr. Lara was not aware that his grandson had firearms in his bedroom, Mr.

13

Lara knew that his grandson would sleep either in his bedroom or in the shed outside. He told the agents that his grandson had been home earlier in the day and had taken a shower. Mr. Lara's recollections about his grandson's presence and activities at home were familial in nature and did not alert the officers to any facts that would undermine a presumption of authority to consent. There was no evidence indicating that Mr. Quezada-Lara's bedroom door had a lock or padlock, that Mr. Quezada-Lara paid rent, or that he had any agreement with his mother and/or grandfather that they could not enter his room without consent. Without any of these indications, and knowing that they were family, the agents were not obligated to inquire further. *Romero*, 749 F.3d at 907.

Based on the agents' testimony as to what Mr. Lara told them about the house and its residents, the Court concludes that Mr. Lara had actual authority to consent to a search of the house, including Mr. Quezada-Lara's bedroom, because Mr. Lara lives there with his daughter, and had access to and control over the premises.

### B. Voluntariness of Consent

"For consent to be valid, two conditions must be met: '(1) There must be a clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied.'" *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007) (quoting *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992)). A consent to search is valid only if voluntary, and "the voluntariness of a consent to search [is determined] under the totality of the circumstances, with the government bearing the burden of proof." *United States. v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994) (citation omitted). "In determining whether a consent to search is voluntary, a court should consider, *inter alia*, physical mistreatment, use of violence, threats, threats of

violence, promises or inducements, deception or trickery, and the physical and *mental condition and capacity of [the consenting party]* within the totality of the circumstances." *Id.* (citing *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993) and *United States v. Lindsey*, 877 F.2d 777 (9th Cir. 1989)) (emphasis added).

Mr. Quezada-Lara argues that Mr. Lara's consent was involuntary because he suffers from dementia and was incapable of giving intelligent consent.

In *United States v. Sims*, 428 F.3d 945, 952-53 (10th Cir. 2005), the Tenth Circuit discussed whether an individual suffering from "brain deterioration" due to Frontotemporal Dementia ("FTD") that "made him unable to resist the pressure upon him at the time," nonetheless had the capacity to consent to a search. The Court stated that "our cases have never required perfect mental ability to find a consent to search was voluntary." *Id.* at 953 (citing *United States v. Gay*, 744 F.2d 368, 376-77 (10th Cir. 1985)). Instead, the issue is "whether, given [defendant's] mental condition, his consent was nonetheless the 'product of a rational intellect and a free will' and made with a 'mental awareness so that the act of consent was that of one who knew what he was doing.'" *Id.* The Court stated:

> Although the record in this case suggests that FTD is a degenerative disorder that could ultimately affect Sims's judgment, Sims has not pointed this Court to any specific evidence of the *extent of his impairment at the time of his consent to search*. Indeed, the officers testified that no aspect of Sims's dysfunction was apparent to them . . . .Moreover, the district court found no evidence that the police had attempted to exploit any of his vulnerabilities.

*Id.* at 953 (emphasis added).

In a similar vein, the Seventh Circuit has stated:

a person's mental capacity is only one factor in determining whether someone's consenting was voluntary, and . . . a person is not precluded from consenting to a warrantless search simply because he or she suffers from a mental disease. *Our review is aimed at "regulating police conduct," and to achieve that objective, the appropriate standard is what objective facts were known to the inquiring officer at the time consent*

15

*was given.*

*United States v. Richards*, 741 F.3d 843, 849 (7th Cir. 2014) (emphasis added). Accordingly, the Court must examine not only the mental capacity of Mr. Lara at the time of the search, but also, what was apparent or not apparent to the agents based on Mr. Lara's behavior and demeanor.

In this case, the two medical reports proffered by Mr. Quezada-Lara indicate that his grandfather *currently* suffers from advanced Alzheimer's dementia. When he testified at the hearing, Mr. Lara was confused and unable to provide coherent answers to questions. He did not recall the night in question, although he said he recognized Agent Stemo. Further, his daughter Ms. Lara testified that she now takes care of her father 24 hours a day and checks on him several times at night. [TR at 115]. This evidence tends to suggest that Mr. Lara presently lacks the mental capacity to give voluntary consent.

However, Mr. Lara's current condition is not at issue. Instead the Court must determine whether Mr. Lara was so mentally incapacitated the night of the search that he could not give informed consent, and what objective facts were known to the inquiring officers at the time consent was given. *See Sims*, 428 F.3d at 953; *Richards*, 741 F.3d at 849.

The testimony of the FBI agents establishes that at the time of the search, Mr. Lara appeared to be lucid. He responded to the agents' request that he come to the back door and then outside to the back porch. He was not agitated or frightened. He gave coherent, plausible responses to the agents' questions. Specifically:

- Agent Stemo, who communicated with Mr. Lara in Spanish, testified that Mr. Lara's responses to her questions were plausible and made sense. She also testified that he did not repeat himself or have trouble understanding her questions.

- Mr. Lara told Agent Stemo that his daughter also lived in the house but that she was currently out of town, in Mexico. This was consistent with Ms. Artega telling Agent Acee earlier that she had been coming by to bring food to Mr. Lara.

16

- In response to agents' questions about the whereabouts of Mr. Quezada-Lara, Mr. Lara said his grandson had been at the house earlier that day for a short period of time and had taken a shower, but he did not know if he was at the house now. Agents found clothing belonging to Mr. Quezada-Lara in the bathroom, confirming Mr. Lara's statement.

- Mr. Lara knew his way around the house. He showed the agents his own bedroom, and correctly identified his grandson's bedroom.

Moreover, the record is devoid of evidence that the agents attempted to coerce Mr. Lara or exploit any of his vulnerabilities. To the contrary, the agents took pains to minimize any potential confusion or intimidation by communicating with Mr. Lara in his native language, having Agent Stemo stay with him during the entire search, asking him to wait on the porch while the initial search was conducted, ushering him into the kitchen once the initial search was completed, explaining his rights, and helping him retrieve clothing from his bedroom.

In this regard, the Court found the testimony of the FBI agents to be straightforward and credible. Agent Acee was forthcoming in admitting he questioned whether Ms. Artega had authority to grant permission to search the house even though she possessed a key to the house and granted permission to search it. Furthermore, he quickly summoned Agent Stemo to help interpret when it became apparent that Mr. Lara spoke only Spanish. Agent Stemo, in turn, took pains to reassure Mr. Lara, to make sure he understood why agents were there, and to obtain first his verbal consent to conduct a safety search and then his written consent to conduct a search for drugs and firearms. The Court finds persuasive Agent Stemo's testimony that—based on Mr. Lara's demeanor and responses to questions she asked—she believed him to be competent to voluntarily consent to the search.

Moreover, the testimony of Ms. Lara suggests that although her father may have had dementia at the time of the search, his dysfunction was limited and perhaps not apparent because he was largely able to care for himself. She testified that she left her father at home alone for

17

several days while she made a trip to Mexico, asking Ms. Artega to "come by and check up on things." [Doc. 33 at 112]. According to the testimony of Agent Acee, Ms. Artega indicated that she was only dropping by occasionally, not staying continuously with Mr. Lara. When Agent Acee encountered her, she had dropped off dinner for Mr. Lara and was leaving the house. This evidence supports a conclusion that Ms. Lara believed, at the time, that her father was capable of being left alone at the house during her absence.

The Court acknowledges that since the search at issue, Mr. Lara's condition has declined substantially. Furthermore, according to Ms. Lara, her father was tearful and distressed when she returned home the next day, saying that people had tried to kill him. It is possible that, without displaying any signs, Mr. Lara was confused and frightened while interacting with the agents. However, the weight of the evidence suggests that Mr. Lara did not seem at all confused or frightened: he understood the agents' questions, did not repeat himself, provided plausible responses to their questions and had a friendly demeanor. The issue before the Court is whether there were indications to the officers that Mr. Lara may not have had the mental capacity to consent, and the credible testimony of the agents establishes that there were no such indications. Mr. Lara's demeanor and conduct that night, as described by the agents, combined with his daughter's testimony that she left him alone while she traveled to Mexico, persuade the Court that the objective facts known to the agents at the time Mr. Lara consented to the search supported their belief that his consent was the "product of a rational intellect and free will" and made with a "mental awareness so that the act of consent was that of one who knew what he was doing." *Sims*, 428 F.3d at 953.

Accordingly, the Court concludes that Mr. Lara had actual authority to consent to the search of Mr. Quezada-Lara's bedroom, and that Mr. Lara's consent was voluntarily given.

18

## V. Conclusion

For the foregoing reasons, Mr. Quezada-Lara's Motion to Suppress [Doc. 22] is denied.

ENTERED this 30th day of July, 2018.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE


Jason Bowles  
*Attorney for Mr. Quezada-Lara*

Letitia Simms  
ASSISTANT UNITED STATES ATTORNEY  
*Attorney for the United States*